IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEFFREY K. SHRAGO, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:20-cv-01097-PX |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | * | |
| | * | |
| Defendant. | | |

***

## MEMORANDUM OPINION

Pending before the Court are cross-motions for partial summary judgment filed by Plaintiff Jeffrey K. Shrago ("Shrago") and Defendant Unum Life Insurance Company of America ("Unum") (ECF Nos. 22 & 25), and Shrago's motion for leave to file a surreply. ECF No. 27. The motions concern the applicability of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to Shrago's claims. The motions have been fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Court DENIES Unum's motion (ECF No. 22) and GRANTS Shrago's motions (ECF Nos. 25 & 27).[1]

**I.   BACKGROUND**

Since 1974, Shrago has worked in commercial real estate at Julien J. Studley, Inc., now known as Savills Studley, Inc. ("Studley"), in its Washington D.C. office. ECF No. 22-3 at 40;

---

[1] Shrago moved for leave to file a surreply after Unum argued this Court must defer on the ultimate question of whether ERISA applies because Shrago did not technically cross-move for partial summary judgment. *Compare* ECF No. 26 at 17–18 *with* ECF No. 27-1. Unum's position is untenable. The parties have already agreed that the Court would resolve the applicability of ERISA in advance of merits discovery and trial. *See* ECF Nos. 13 ("The parties believe the most efficient and effective means of disposing of this case is to first address the question of whether the disability insurance policy issued by Unum to Mr. Shrago is subject to ERISA."); *see also* ECF No. 20. Moreover, Shrago made clear in his surreply that he is cross-moving for summary judgment. ECF No. 27. Thus, the Court treats Shrago's response at ECF No. 25 as also a cross-motion for summary judgment on the inapplicability of ERISA.

ECF No. 25-2 at 2–3. In December 1994, Shrago applied for and purchased individual disability insurance through Defendant Unum as part of its "Flexbill" program ("the Flexbill policy"). ECF No. 22-3 at 40–44; ECF No. 25-2 at 2; ECF No. 22-7. At the time he applied for this insurance, Shrago did not occupy a management position and had no ownership interest in the company, which he made clear in his policy application.[2] ECF No. 22-3 at 40–44; ECF No. 25-2 at 2; ECF No. 25-4 at 13–14. Two of Shrago's colleagues ("SL" and "TF"), also commercial realtors with no ownership interest in Studley, applied for individual disability insurance with Unum that same month. ECF No. 22-4 at 10–14; ECF No. 22-5 at 12–16. All three employees checked the box on the Unum application indicating each would purchase an "Executive Professional" policy. ECF No. 22-3 at 41; ECF No. 22-4 at 10; ECF No. 22-5 at 13; ECF No. 25-4 at 16.

As to the Flexbill policy, Studley did not present it to Shrago, TF, or SL, or to any of its employees for that matter, and never advertised or promoted it within the company. ECF No. 25-2 at 4; ECF No. 25-8 at 2; ECF No. 25-9 at 2; ECF No. 25-4 at 20. Rather, the three gentlemen learned about this opportunity through an independent broker, Maynard London ("London"), who was SL's father, worked at Personalized Insurance Services, Inc. in Baltimore, Maryland. ECF No. 25-2 at 5, 53–63; ECF No. 22-3 at 45; ECF No. 22-4 at 15, 20; ECF No. 22-5 at 17, 22; ECF No. 22-6 at 12. No evidence connects London to Studley. *See* ECF No. 25-7 at 4; ECF No. 25-9 at 2; ECF No. 25-2 at 5.

London recommended Unum's "Flexbill" program so that the three insureds would receive a 15% discount if they agreed to have their premiums billed annually on a single bill—

---

[2] Unum's characterization of Shrago as a "senior managing director" at the time he obtained his individual disability insurance is not supported by the record. *See* ECF No. 22-1 at 12 (citing ECF No. 22-3 at 59, Ex. 2, UA-IDI-APPFILE-000115). Further, the Flexbill policy's terms and conditions remained unchanged even as Shrago received promotions at Studley. ECF No. 25-2 at 2.

2

hence the name "Flexbill."  ECF No. 25-2 at 5, 53–63; ECF No. 25-3 at 3–4; ECF No. 25-5 at 9; ECF No. 25-9 at 2.  Shrago, SL, and TF agreed to this arrangement, and instructed Unum to send the premium notices to Shrago's home address listed as: "Julien Studley, Inc., c/o Jeff Kazis Shrago, 9544 Newbridge Drive, Potomac, Maryland 20854."  ECF No. 25-2 at 5; ECF No. 22-3 at 40–41; ECF No. 22-4 at 10; ECF No. 22-5 at 13.  Aside from these three insureds, no evidence reflects any involvement by another Studley employee in processing the applications.  ECF No. 25-5 at 16, 17, 19.

Pamela Yankura ("Yankura"), an underwriter at Unum, reviewed the Flexbill policy applications for the three men.  ECF No. 22-3 at 25–26, 36; ECF 22-4 at 6, 8; ECF 22-5 at 7.  No record evidence establishes what, if any, criteria Unum used to ascertain their eligibility for the Flexbill program.  Attempting to fill this evidentiary hole, Unum submits a 1986 "Customax Flexbill Sales & Information Guide" ("the Sales Guide") that, on its face, lays out the criteria for "Owner-Manager" and "Owner-Professional" Flexbill policies—which were catered to "small professional firms and businesses."  ECF No. 22-2 at 1–2, 7; ECF No. 25-4 at 9, 11.  Unum shared the Sales Guide with its sales force to market the Flexbill program to small businesses as opposed to individual insureds.  ECF No. 25-3 at 7; ECF No. 25-4 at 10.

Notably, the Sales Guide identifies by name several insurance products for which Flexbill was available.  ECF No. 22-2 at 2, 4–5 (describing Protection III and Flexbill Discount products for "Owner-Professional" and "Owner-Management" segments).  The Sales Guide makes no mention of any "Executive Professional" policy.  *Compare* ECF No. 22-2 *with* ECF No. 22-3 at 41; ECF No. 22-4 at 10; ECF No. 22-5 at 13.  The Guide, however, did make clear that the Flexbill program was available to any group application which met the following criteria: (1) the group includes at least 3 individuals and is formed for purposes other than the purchase of

insurance; (2) 80% of the total monthly indemnity is written on AAA or AAA* risks; (3) the total monthly coverage is at least $5,000; and (4) all policies count towards meeting the discount requirements. ECF No. 22-2 at 5. Notably, Unum underwriters retained "discretion" to "deviate" from Unum's underwriting guidelines when appropriate. ECF No. 25-4 at 4; *see also* ECF No. 25-3 at 4.

After reviewing Shrago's application, Yankura determined that Shrago would need to accept certain policy exclusions, due to pre-existing health conditions, before Unum could award coverage. ECF No. 22-3 at 25–26. Shrago agreed to these changes. *Id.* at 6. But once again, the record reflects that Unum negotiated directly with Shrago as to these terms. *See id.* at 25–26, 57–60, 80.

Then, on March 11, 1995, Unum officially issued the Flexbill policy to "Jeff K. Shrago." ECF No. 22-7 at 1. Unum set up a "single billing arrangement" and "automatically applied" the discount to Shrago, SL, and TF's policies. ECF No. 25-2 at 5–6. It also assigned the policies a single Flexbill account under the name "Julien Studley" with a single group number of 350530G1. ECF No. 22-6 at 4. Throughout the policy term, Unum internally would refer to the policies by both the Flexbill group number and individual policy numbers. *See, e.g.*, *id.* at 4–7, 14, 18.

The Flexbill policy makes no mention of ERISA or its applicability. *See* ECF No. 22-7; *see also* 29 C.F.R. § 2520.102-3(t)(1). Nor does it describe any ERISA-compliant procedures for petitioning or challenging an insurer's denial of coverage per ERISA's terms. *See* 29 U.S.C. §§ 1133, 1135; 22 C.F.R. § 2560.503-1(b)(2). The policy also does not identify a "plan administrator" or "plan sponsor" as required under ERISA. *See* ECF No. 22-7; ECF No. 25-4 at 7; 29 U.S.C. § 1022.

For more than twenty years, Unum sent the Flexbill policy premium invoice to Shrago, either at his home address or at his office. ECF No. 22-3 at 40–41; ECF No. 25-2 at 5–8; ECF No. 25-5 at 9; ECF No. 22-6 at 1, 12. Initially, Unum sent the invoice to Shrago's home address in Potomac, Maryland, addressed to "Julien J. Studley Inc., c/o Jeff Kazis Shrago." ECF No. 22-3 at 40–41; ECF No. 25-5 at 8–9. However, after Unum delivered the invoice to SL one year by mistake, Shrago instructed Unum to use his work address as follows: "Mr. Jeff. K. Shrago, Julien J. Studley, Inc. Columbia Square East, 555 Thirteenth Street, N.W., Washington, D.C. 20004-1115." ECF No. 22-6 at 12; ECF No. 25-2 at 6. Shrago eventually directed Unum to send the invoice to his home address. ECF No. 22-6 at 5.

Although Shrago listed his work address as his mailing address for a period of time, the method of payment never changed. All three gentlemen, every year, cut separate checks issued from their personal bank accounts for their individual portions of the premium, and Shrago would send the checks to Unum. *See, e.g.*, *id.* at 1–2, 20; ECF No. 22-3 at 53; ECF No. 25-2 at 6–8; ECF No. 25-4 at 6; ECF No. 25-5 at 8; ECF No. 25-9 at 2. Studley never facilitated these premium payments. ECF No. 25-2 at 3–6; ECF No. 25-5 at 6, 8. Indeed, Studley "was not even aware [that these men] had purchased" individual policies. ECF No. 25-2 at 4; *see also* ECF No. 25-8 at 2; ECF No. 25-4 at 20; ECF No. 25-5 at 6. Thus, it is not surprising that Studley has no records of any kind regarding Shrago's Flexbill policy. *See* ECF No. 25-6.

By contrast, Studley has provided group long-term disability insurance to its employees for forty years. ECF No. 22-3 at 40; ECF No. 25-6 at 10; ECF No. 25-2 at 4, 13–51. Studley most recently purchased a group plan (the "group policy" or "group insurance") through Unum's subsidiary, First Unum, in 2014. ECF No. 25-2 at 3, 13–51; ECF No. 22-10 at 4 n.3. A New York insurance broker purchased the group policy on Studley's behalf. ECF No. 25-6 at 44.

Studley is the named policyholder and pays the full cost of coverage for each insured employee. ECF No. 25-2 at 14, 16; ECF No. 25-5 at 5–7. Studley's human resources department in New York manages the group policy. ECF No. 25-2 at 3; ECF No. 25-6 at 25. The group policy expressly states that its terms are governed by ERISA. ECF No. 25-2 at 14, 47. Studley's Vice President of Human Resources, Dean Feratovic, is designated as the ERISA "plan administrator." ECF No. 25-6 at 82, 86.

On January 1, 2017, Shrago became disabled on account of his "severe lumbar stenosis." ECF No. 22-8 at 11. In December 2017, he submitted claims to receive disability benefits under the group policy, as well as the benefits under the Flexbill policy. *Id.* at 1–14. On June 8, 2018, First Unum approved Shrago's disability claim under the group policy and began paying benefits of $20,000 per month. *Id.* at 3. As for the Flexbill policy, Unum decided that Shrago's disability arose out of a "sickness," not an "injury," and accordingly limited his benefit period to twenty-four months under the policy provisions. *Id.* at 12.

Shrago challenged the limitation of benefits on the Flexbill policy through Unum's internal appeals process. Unum denied Shrago relief. *Id.* at 15. Shrago next filed suit in this Court against Unum, alleging that Unum breached the terms of the Flexbill policy when it construed his disability as one stemming from "illness" and not "injury." ECF No. 1. Unum now moves for partial summary judgment, arguing that because the Flexbill policy was purchased through the insured's employer, Studley, ERISA applies, thus preempting Shrago's state law breach of contract claims. ECF No. 22-1 at 11. Shrago cross-moves for summary judgment on the same question, arguing that no evidence supports ERISA's application to the Flexbill policy, and so his state law claims should move forward on the merits. ECF No. 25-1; ECF No. 13; ECF No. 20. The Court considers the motions together, and for the following

reasons, concludes as a matter of law that ERISA does not apply to the Flexbill policy.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

"Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'"  *Snyder ex rel. Snyder v. Montgomery Cnty. Pub. Sch.*, No. DKC-08-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

Ultimately, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co*., 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted. *Celotex*, 477 U.S. at 322.

## III.   ANALYSIS

### A.   ERISA

ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983) (citations omitted). "ERISA safeguards these interests in a variety of ways, *e.g.*, by creating comprehensive reporting and disclosure requirements, by setting standards of conduct for fiduciaries, and by establishing an appropriate remedial framework." *Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1132 (1st Cir. 1995) (citing 29 U.S.C. §§ 1021–1031; 1101–1114; 1131–1145); *see also Shaw*, 463 U.S. at 91.  Accordingly, where ERISA applies, the Court must "set[] to one side 'all laws, decisions, rules, regulations, or other State action having the effect of law, of any State,'" *Johnson*, 63 F.3d at 1132 (quoting 29 U.S.C. § 1144(a)).  Instead, ERISA's "uniform body of benefits law" governs the dispute.  *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see also Ballard v. Leone*, No. MJG–11–779, 2012 WL 665987, at *2 (D. Md. Feb. 28, 2012).  The party arguing that ERISA preempts state law bears the burden of demonstrating its applicability to the policy in question.  *See Great-West Life & Annuity Ins. Co. v. Info. Sys. & Networks Corp.*, 523 F.3d 266, 270 (4th Cir. 2008).

By its own terms, ERISA applies only to employee benefit plans, which includes welfare benefit plans and pension benefit plans. *See* 29 U.S.C. §§ 1002(3), 1003(a).  Relevant here, ERISA defines an employee welfare benefit plan as:

> [A]ny plan, fund, or program which was . . . established or maintained by an employer . . . for the purpose of providing for its

>participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, *disability*, death or unemployment, or vacation benefits, or severance benefits . . . .

*Id.* § 1002(1) (emphasis added).  From this, the Fourth Circuit has held that ERISA applies only to "(1) a plan, fund or program, (2) established or maintained (3) by an employer, . . . (4) for the purpose of providing a benefit, (5) to employees or their beneficiaries."  *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 417 (4th Cir. 1993) (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982)).

The parties' dispute focuses squarely on whether Studley, as the employer, "established or maintained" the Flexbill policy.  *See* ECF No. 22-1 at 16; ECF No. 25-1 at 26.  Satisfaction of this element is critical for obvious reasons.  ERISA only applies when "[a]n employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements."  *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 9 (1987).  Indeed, this principle lies at the heart of Congress' reasons for passing ERISA in the first place—to incentivize employers to take these obligations on willingly by establishing "a uniform administrative scheme."  *Id.*  Thus, where no evidence exists that the employer has adopted such an "administrative scheme" consistent with ERISA's terms, the Court would be hard pressed to find that the benefits plan is "established or maintained" by the employer.  *Lomas v. Red Storm Entm't, Inc.*, 49 Fed. Appx. 396, 400 (4th Cir. 2002).

**B.      ERISA's Safe-Harbor Provision**

To put some meat on the bones of the "established or maintained" element, the Secretary of Labor promulgated a "safe harbor" regulation that aims to define when employer involvement

9

in a plan is so minimal that the employer cannot be said to have "established or maintained" it. *Johnson*, 63 F.3d at 1133.

> The safe harbor provision states:
>
>> The term 'employee welfare benefit plan' shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:
>>
>> (1) No contributions are made by an employer or employee organization;
>>
>> (2) Participation [in] the program is completely voluntary for employees or members;
>>
>> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>>
>> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j).

Where the party seeking to escape ERISA's reach demonstrates the applicability of the safe-harbor provision, then the employer has not "established or maintained" the plan as a matter of law. *Johnson*, 63 F.3d at 1133; *see also United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986) (requiring party seeking safe-harbor protection to satisfy all four criteria). Ultimately, the safe-harbor provision rests on the sound policy that the "absence of employer involvement vitiates the necessity for ERISA safeguards." *Johnson*, 63 F.3d at 1133; *see also McCann v. Unum Provident*, 907 F.3d 130, 143 (3rd Cir. 2018) (same).

Shrago argues vigorously that Studley's lack of involvement in the Flexbill policy

10

triggers the safe-harbor provision, and so ERISA cannot preempt his state law claims. Unum, of course, argues to the contrary. To explain why Shrago has the better argument necessitates examining the safe harbor's applicability to Studley in some detail.

### 1.   Whether Studley "made contributions" to the policy

As to the first safe-harbor requirement, Shrago must demonstrate that no record evidence reflects Studley ever made "contributions" to the Flexbill policy. *See* 29 C.F.R. § 2510.3–1(j). It is clear that Studley never paid any of the premiums or otherwise provided any monetary assistance to obtain or maintain coverage. ECF No. 22-3 at 40–41, 53; ECF No. 22-4 at 10; ECF No. 22-5 at 13; ECF No. 22-6 at 1–2, 20; ECF No. 25-2 at 6–8; ECF No. 25-4 at 6; ECF No. 25-5 at 8; ECF No. 25-9 at 2. And for the entire life of the policy, Shrago received the joint bill for the three men, collected their personal checks, and sent them to Unum to satisfy the discounted premium. *See* ECF No. 22-3 at 40–41; ECF No. 22-6 at 1–2, 20; ECF No. 25-2 at 5. Accordingly, no evidence reflects that Studley ever made any contributions to the Flexbill policy or even devoted any administrative resources to paying the premiums at any point during the life of the policy.

Unum, however, argues that Shrago's mere receipt of the 15% Flexbill discounted rate alone can amount to a corporate "contribution" under the first safe-harbor prong. ECF No. 22-1 at 28. Unum cites legion cases in support of its position, but in each, the discounted premiums were on account of an employer's effort and involvement. *See Healy v. Minn. Life Ins. Co.*, No. DGK-11-00659, 2012 WL 566759, at *5 (W.D. Mo. Feb. 21, 2012); *see also Gooden v. Unum Life Ins. Co. of Am.*, 181 F. Supp. 3d 465, 471–72 (E.D. Tenn. 2016). Specifically, where the discounted rate was "based on an employer's negotiation of the plan, agreement to pay the premiums, or even grouping of multiple employees on one bill," the employer's efforts

amounted to a contribution such that the plan fell outside of the safe-harbor provision.  *Healy*, 2012 WL 566759, at *5 (citing *Moore v. Life Ins. Co. of N. Am.*, 708 F. Supp. 2d 597, 607 (N.D. W.Va. 2010); *Spillane v. AXA Fin., Inc.*, 648 F. Supp. 2d 690, 698 (E.D. Pa. 2009)).  These cases thus reflect that an employer must have some involvement in securing a discount for it to qualify as a "contribution."  *See* ECF No. 22-1 at 28 (citing *Henderson v. Paul Revere Life Ins. Co.*, No. SAF-11-1992, 2013 WL 1875151, at *8 (N.D. Tex. May 6, 2013) ("an employer nevertheless 'contributes' for purposes of the safe harbor provision if the employees benefit from a rate structure or premium discount the *employer was able to negotiate* in obtaining group benefits" (emphasis added)); *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 449 (5th Cir. 2007) (firm paid 100% of premiums for certain class of employees and then negotiated "unitary rate structure … for disability coverage as a package for all classes"); *Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 538 (7th Cir. 2000) (employer "purchased the plan and offered it to its employees and … started paying the premiums"); *Barnes v. Provident Life & Acc. Ins. Co.*, No. KNM-17-586, 2019 WL 1552503, at *4 (E.D. Tex. Feb. 13, 2019) (also requiring "an employer's involvement in bargaining for disability coverage"); *Bommarito v. Nw. Mut. Life Ins. Co*., No. WBS-15-1187, 2018 WL 3537118, at *4 (E.D. Cal. July 23, 2018) (when "employee[s] receive a benefit they would not have absent the action *taken by their employers*, [the] employer's action should be considered a contribution" (emphasis added)); *Healy*, 2012 WL 566759, at *4–5 (finding contribution where insurer billed employer directly and employer paid premiums owed by all employees in one bill to the insurer); *Brown v. Paul Revere Life Ins. Co*., No. NLS-01-1931, 2002 WL 1019021, at *7 (E.D. Pa. May 20, 2002) ( "Where an *employer provides* its employees benefits that they cannot receive as individuals, it has contributed to an ERISA plan." (emphasis added))).

On this point, Unum overlooks the utter lack of evidence that Studley played any role in obtaining, negotiating, or securing the 15% Flexbill discount.  London, an independent broker with no ties to Studley, acted solely on behalf of the three individual insureds to negotiate the policy.  *See* ECF No. 25-2 at 5–6, 53; ECF No. 25-9 at 2; ECF No. 25-4 at 6–8, 20.  Studley, for its part, had nothing to do with those negotiations, with processing the payments, or with facilitating the discount in any way.  *See* ECF Nos. 22-3, 22-4, 22-5 & 22-6; *see also* ECF No. 25-2 at 4; ECF No. 25-4 at 6, 20; ECF No. 25-5 at 9, 12, 16–17, 20, 141; ECF No. 25-6 at 5–7; ECF No. 25-8 at 2; ECF No. 25-9 at 2.  Studley, in fact, had been so removed from the process that in this litigation, it could produce no documents—no "applications, premiums, bills, ERISA forms, [or] any documents relating to administrative services used to process or manage this policy"—pertinent to the Flexbill policy.  ECF No. 25-6 at 2, 5–7.  Simply put, the Court could find no evidence that Studley played any role in securing the 15% discount.

Undaunted, Unum urges that Studley's involvement may be inferred from Shrago's having directed Unum to send the premium invoices first to "Julien J. Studley, Inc. c/o Jeff Kazis Shrago" and then later to "Mr. Jeff. K. Shrago, [c/o] Julien J. Studley, Inc."  ECF 22-3 at 40–41; ECF No. 22-6 at 12.  But reference to Studley in a mailing address does not permit the rational inference that Studley had any involvement in the plan.  This is especially so where no one *but* Shrago ever received the premium invoices or facilitated payment.  *See* ECF No. 22-3 at 41; ECF No. 22-6 at 5; ECF No. 25-2 at 3–6; ECF No. 25-5 at 6, 8.

Unum next presses that its 1986 Sales Guide, as interpreted by one of its underwriters, shows that Studley "must have been" involved in the Flexbill policy because Unum would not have awarded the Flexbill discount without employer involvement.  ECF No. 22-2; ECF No. 22-1 at 17; ECF No. 25-4 at 12–15, 20–21.  Even if is true that Unum usually extended the Flexbill

13

program to employers,[3] the relevant question is not whether Unum *thought* Studley was involved. Rather, the key is whether Studley *was* involved. The record on this point is clear. When viewing the evidence most favorably to Unum, nothing shows Studley had any hand in securing the Flexbill discount.

A final point on this first prong of the safe-harbor provision. Unum reads an arcane Treasury regulation pertaining to extending COBRA health coverage to support that the mere receipt of a premium discount for employees is enough to find an employer "made contributions" to the plan. *See* ECF No. 22-1 at 21 (citing 26 C.F.R. § 54.4980B–9); ECF No. 26 at 13; *see also Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d 1, 5 (D.D.C. 2002). But even Unum recognizes that the Treasury regulation retains force only "where an employer arranged for discounted insurance benefits." ECF No. 22-1 at 21. In this respect, Unum's efforts are misdirected because no evidence reflects that Studley "arranged for discounted benefits" as to this policy. *Id.* (citing *Boles v. Unum Life Ins. Co. of Am.*, 847 F. Supp. 2d 1161, 1165–67 (D. Neb. 2012) (employer billed and paid premiums on employee's behalf); *D'Elia v. Unum Life Ins. Co. of Am.*, 223 F. Supp. 3d 380, 388 (E.D. Pa. 2016) (same); *Harding v. Provident Life & Acc. Ins. Co.*, 809 F. Supp. 2d 403, 408 (W.D. Pa. 2011) (same)); *see also Mastaler v. Unum Life Ins. Co.*, No. DMS-11-1210, 2012 WL 579537, at *1–2 (S.D. Cal. Feb 22, 2012) (plaintiff's employer paid premiums while plaintiff was employed); *Brown*, 2002 WL 1019021, at *7 (plaintiff's employer organized payment of premiums using pre-tax income through bonus deductions); *Weimer v. Unum Life Ins. Co. of Am.*, No. DLG-13-14352, 2014 WL 12519755, at

---

[3] The record actually reflects that Unum did not follow its own Sales Guide criteria for the Flexbill program, at least in Shrago's case, and more broadly afforded its underwriters discretion to deviate from company guidelines when appropriate. ECF No. 25-2 at 5, 53–63; ECF No. 25-3 at 2–6; ECF No. 25-4 at 4. Based on this, the Court cannot even fairly infer that every time a policy issued per the Flexbill program, it was extended *only* to or through an employer.

*3 (S.D. Fla. Feb. 14, 2014) ("The Court finds Defendant's arguments concerning COBRA coverage and interpretation to be unavailing.").[4]

In short, when viewing the record evidence most favorably to Unum, the Court concludes that Studley did not make contributions to the plan. It did not pay or collect the premiums or facilitate the receipt of the 15% Flexbill discount. Indeed, Studley was none the wiser that the Flexbill policy even existed. On this record, Shrago has convinced the Court that the first prong of the safe-harbor provision is met.

### 2. Shrago's voluntary participation in the policy

The second prong of the safe-harbor provision need not detain the Court long. Unum argues that no evidence demonstrates Shrago's participation in the Flexbill policy had been "completely voluntary." ECF No. 22-1 at 30. Even by Unum's own recitation, this argument is meritless. The record evidence indisputably shows that Shrago applied on his own for the Flexbill policy and personally coordinated with two of his colleagues to get the discount. *See* ECF No. 25-2 at 3–6; ECF No. 25-3 at 4–5; ECF No. 25-4 at 6; ECF No. 25-5 at 6; ECF No. 25-6 at 2; ECF No. 25-9 at 2. No evidence undermines that Shrago's decision to purchase this insurance was anything other than his and his alone. The Court thus finds that, as a matter of law, the second prong of safe harbor also cuts in Shrago's favor.

Although Unum only contests the first and second requirements of the safe harbor provision, the Court still must address whether Shrago has produced sufficient uncontroverted evidence to support application of the remaining two requirements. The Court briefly addresses

---

[4] At least one court has written that this Treasury regulation "suggests that simply receiving benefits at lower cost does not equal an employer contribution." *Brown*, 2002 WL 1019021, at *7 n.7; *see also Pope v. Washington Nat'l Ins. Co.*, No. HGD-05-1412, 2005 WL 8158051, at *6 (N.D. Ala. Dec. 15, 2005) ("COBRA plans are not ERISA plans; there is no similar regulation in the ERISA regulations; and the courts are far from uniform on this issue.").

each.

### 3.     No employer endorsement

The third prong recognizes that some ministerial employer involvement in the benefits plan does not mean the employer has endorsed the plan such that ERISA should apply. *See Johnson*, 63 F.3d at 1134 (an employer need not "build a moat around a program or to separate itself from all aspects of program administration" for the plan to fall outside ERISA). An employer does not endorse a policy, for example, where it merely publicizes the plan to its employees or collects premiums through payroll deductions and then passes them onto the insurer. *See* 29 C.F.R. § 2510.3–1(j); *see also Casselman v. Am. Family Life Assur. Co.*, 143 Fed. Appx. 507, 509–10 (4th Cir. 2005); *Ballard*, 2012 WL 665987, at *3. But where an employer's activities would "lead a worker reasonably to conclude that a particular group insurance program is part of a benefit arrangement backed by the company," then the employer is said to have endorsed the plan. *Johnson*, 63 F.3d at 1134; *see also Casselman*, 143 Fed. Appx. at 510 (finding endorsement where "the employer … expresses to its employees … any positive, normative judgment regarding the program" (quotation omitted)); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 977 (5th Cir. 1991) (finding endorsement where the employer distributed a booklet bearing the employer's name and corporate logo and encouraged employees to carefully consider purchasing the plan); *Ballard*, 2012 WL 665987, at *4 (finding no endorsement where employer "did no more than permit [insurer] to conduct a sales meeting on company premises").

Here, no evidence exists that Studley was even aware that the Flexbill policy existed, let alone endorsed it. In this regard, no evidence suggests that Studley maintained such ministerial involvement allowable under the safe-harbor provision. Thus, Shrago easily satisfies this third requirement.

### 4. No employer consideration received in exchange for issuing the policy

Likewise, the record indisputably reflects that Studley never received any consideration for the issuance of the Flexbill policy to three of its employees. Nothing reflects Studley securing any tax write off, reimbursement, or any other tangible benefit in connection with the Flexbill policy. *See* 29 C.F.R. § 2510.3–1(j); *see also* ECF No. 25-1 at 25–26. Construing the record most favorably to Unum, the Court finds the fourth safe-harbor requirement is met.

In sum, the record indisputably demonstrates that Studley's non-involvement qualifies for the safe-harbor exception. Accordingly, Studley cannot be said to have "established or maintained" the Flexbill policy. And so, per ERISA's plain terms, the Flexbill policy is not an "employee welfare benefit plan" within the purview of the statute. *See* 29 U.S.C. § 1002(1). Summary judgment on the inapplicability of ERISA is granted in Shrago's favor on this basis alone.

### C. No Other Evidence Supporting Employer "Established or Maintained" the Policy

Shrago alternatively argues that even if somehow Studley did not squarely fall under the safe-harbor provision, he is still entitled to summary judgment because no evidence demonstrates that Studley "established or maintained" the Flexbill policy. ECF No. 25-1 at 26. Notably, a plan that fails to satisfy the safe-harbor provision does not "automatically" qualify as one established and maintained by the employer. *Johnson*, 63 F.3d at 1133. Rather the evidence must still be "subject to further evaluation under the conventional tests," *id.* (citation omitted), to determine whether the employer has adopted an "'ongoing administrative program to meet the employer's obligation,'" *Lomas*, 49 Fed. Appx. at 400 (quoting *Fort Halifax*, 482 U.S. at 11); *see also Custer*, 12 F.3d at 417 (requiring "some payment and manifestation of intent by the employer . . . to provide a benefit to the employees").

17

At the risk of sounding repetitious, no record evidence shows Studley was involved in negotiating, securing, administering, or overseeing the Flexbill policy.  And no employer involvement logically means that it did not establish any "ongoing administrative scheme" in connection with the Flexbill policy.  *Fort Halifax*, 482 U.S. at 18.   Because no evidence suggests that Studley maintained or established the policy in question, the Court concludes that ERISA does not preempt Shrago's contract claims.

## IV. CONCLUSION

For the foregoing reasons, the Court finds, as a matter of law, that ERISA does not apply to Shrago's individual policy.  It therefore denies Unum's motion for partial summary judgment (ECF No. 22), grants Shrago's cross-motion for partial summary judgment (ECF No. 25), and grants Shrago's motion for leave to file a surreply (ECF No. 27).  A separate Order follows.

 7/28/2021                                           /s/
Date                                              Paula Xinis
                                                  United States District Judge